TRACY RACICOT HUCKE, Wyoming Bar No. 7-4880
Wyoming Branch Chief
214 W. Lincolnway Ste. 31A
Cheyenne WY 82001
307-772-2781
Tracy.Hucke@fd.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     v.<br><br>STEVEN SHOBERT,<br><br>             Defendant. | CASE NO. 23-CR-153-SWS |

## MOTION TO DISMISS COUNT ONE

Steven Shobert moves to dismiss Count One of the Indictment. Prosecution under Count One violates Mr. Shobert's Second Amendment rights.

## INTRODUCTION

On June 23, 2022, the Supreme Court issued its opinion in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111 (2022). That decision upended Second Amendment doctrine, replacing the interest-balancing approach with an analysis grounded only in constitutional "text and history." Id. at 2129. Criminalizing gun possession pursuant to 18 U.S.C. § 922(o) is unconstitutional under Bruen's "text and history" standard. 142 S. Ct. at 2138. Bruen instructs that "when the Second Amendment's plain text covers an individual's conduct, the

Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. at 2126. The Second Amendment's "plain text" entitles "the people" to the right to keep and bear arms, and nothing in that text or the Supreme Court's cases holds that machine guns are not "bearable arms." And, under Bruen's "text and history" standard, the government will be unable to rebut the presumption that § 922(o) is unconstitutional. The United States' "historical tradition of firearm regulation" shows that to qualify as constitutional, laws can prohibit possession of only those arms that are both dangerous and unusual. As further set forth below, nearly three quarters of a million people legally own machine guns in the United States—making the possession of such weapons far from unusual.

## RELEVANT FACTS

On July 28, 2023, two officers from the Worland Police Department and two Washakie County Sheriff's deputies searched Mr. Shobert's home while he was in the hospital under an allegedly consensual search. They seized all firearms, firearm parts, and ammunition they located. According to the government, among items seized were "three AR-15 type machinegun conversation devices, and one 9mm Glock," which was modified using a machinegun conversion device commonly known as a "Glock Switch."

Mr. Shobert was charged by Indictment of violating 18 U.S.C. §§ 922(o) and 924(a)(2), for the alleged possession of these items (Count One). He was also

indicated on a violation of 26 U.S.C. §§ 5861(d) and 5845(a), for alleged possession of a short-barreled rifle without a permit.

## ARGUMENT

### I. Bruen's "text and history" standard guides Second Amendment jurisprudence.

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court recognized that, based on the text of the Second Amendment and history, the amendment "conferred an individual right" "to possess and carry weapons in case of confrontation." Id. at 576, 582, 592-95.

But in Heller, the Supreme Court did not go any further than resolving the specific Second Amendment claim raised in that case. The Court did not definitively establish a test for evaluating other Second Amendment claims, define the broader contours of the fundamental Second Amendment right, or delimit the outer bounds of that right. See United States v. Jimenz-Shilon, 34 F.4th 1042, 1050 (11th Cir. 2022) (Newsom, J., concurring) (recognizing that Heller left the lower courts "in an analytical vacuum;" citing Silvester v. Becerra, 138 S. Ct. 945, 947 (2018) (Thomas, J., dissenting from denial of certiorari) ("acknowledging that the Supreme Court 'has not definitively resolved the standard for evaluating Second Amendment claims'")).

More recently in Bruen, the Supreme Court set forth a test for deciding the constitutionality of all firearm regulations. After first deciding that the courts of

appeals had misunderstood and misapplied Heller by embracing means-end scrutiny as having any role in Second Amendment analysis, see Bruen, 142 S. Ct. at 2126-29, Bruen set forth the "text and history" approach of Heller by newly bifurcating "text" and "history" into separate steps of an analysis to be used for deciding the constitutionality of all firearm regulations. See Nat'l Rifle Ass'n v. Bondi, 61 F.4th 1317, 1321 (11th Cir. 2023).

At Step One of Bruen's Second Amendment test, courts are to consider only whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. If it does, Bruen held, "the Constitution presumptively protects that conduct." Id. And, Bruen held, regulating presumptively protected conduct is unconstitutional unless the government, at Step Two of the analysis, can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." Bruen, 142 S. Ct. at 2137.

For the first time, Bruen also articulated specific burdens and rules to govern the historical "tradition" inquiry. First, Bruen made clear that the burden of proof at Step Two rests entirely with the government. The government alone must "establish the relevant tradition of regulation." Id. at 2135, 2149 n.25. If it does not, courts "are not obliged to sift the historical materials for evidence to sustain the [challenged] statute." Id. at 2150. Rather, Bruen held, consistent with ordinary "principle[s] of party presentation," courts must "decide a case based on the historical record compiled by the parties." Id. at 2130 n. 6. If that record yields

"uncertainties," the Court dictated, courts should rely on Bruen's "default rules"—the presumption of unconstitutionality at Step One and the government's burden at Step Two—"to resolve [those] uncertainties" in favor of the view "more consistent with the Second Amendment's command." Id. In other words, and consistent with the rule of lenity, any possible tie on a Second Amendment challenge goes to the defendant.

Second, whereas in Heller and Bruen, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a 'distinctly similar' historical regulation addressing the problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Bruen, 142 S. Ct. at 2131. Stated differently, § 922(o) is unconstitutional unless the government shows a tradition of "distinctly similar historical regulation" as of 1791 when the Second Amendment was ratified. Id. at 2126, 2131.

Third, the government's burden at Step Two of the Bruen analysis does not stop at identifying a "distinctly similar historical regulation." Rather, the government must show that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." Id. And a "tradition" of regulation requires more than one or two isolated examples. It requires a "widespread" historical practice "broadly prohibiting" the conduct in question. Id. at 2137-38. Although Bruen did not establish a clear threshold for determining when a historical practice rises to the level of a "tradition," it did hold that "a single law in a single State" is not enough, and even expressed doubt that regulations of three of

the thirteen colonies "could suffice." Id. at 2142-45; see also United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *22 (S.D. Miss. June 28, 2023) (observing that Bruen cast doubt on the possibility that even three colonial regulations were enough to constitute a "tradition" of regulation).

Finally, in weighing historical evidence, Bruen underscored that courts must take careful account of the relevant time frame. Indeed, Bruen held, "when it comes to interpreting the Constitution, not all history is created equal." Id. at 2136. As recognized in Heller, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," which, in the case of the Second Amendment, was in 1791. Id. As a general rule, the longer a historical regulation pre- or post-dates this period, Bruen determined, the less relevance it carries. Id. at 2136-37. While historical practices "from the early days of the Republic" may be relevant in interpreting an "ambiguous constitutional provision" if the practice was "open, widespread, and unchallenged," id. at 2137, Bruen held, the relevance of such practices quickly fades and ultimately vanishes as one approaches the mid- to late-19th century. Id. at 2137. At most, Bruen found, practices from the mid-late 19th century can provide "secondary" evidence to bolster or provide "confirmation" of a historical tradition that "had already been established." 142 S. Ct. at 2137. But indisputably, by the time one gets to the 20th century, the relevance of historical evidence is all but nonexistent, so much so that the Court in Bruen declined to "address any of the 20th century historical evidence brought to bear by [the government] or their amici." Id.at 2154 n.28. In short, to meet the Bruen Step Two

inquiry, the historical tradition must be "longstanding," id. at 2139, which means dating from 1791.

## II. § 922(o) is unconstitutional under the Second Amendment facially and as-applied.

Count One charges Mr. Shobert with violating 18 U.S.C. § 922(o). Section 922(o), which bans machine gun possession, violates the Second Amendment both facially and as applied to Mr. Shobert because the statute criminalizes possession of firearms "in common use" for the purpose of self-defense. The statute is inconsistent with the Nation's historical tradition of firearms restrictions.

Heller confirmed that the right the Second Amendment protects is an individual right that includes "us[ing] arms in defense of hearth and home." Heller, 554 U.S. at 635. The word "arms" in the Second Amendment includes both "armour of defence" and "weapons of offence." Heller, 554 U.S. at 581. Since the founding of this country, "arms" has included "all firearms" that a person can "bear." Id. ("The 18th-century meaning is no different from the meaning today."). Further, the Second Amendment presumptively protects "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id. at 582; see also Caetano v. Massachusetts, 577 U.S. 411, 412 (2016) (holding stun guns to be protected arms).

While the "Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"—including machineguns. Bruen, 142 S. Ct. at 2132. Thus, the plain language of the Second Amendment covers machineguns under the

first step of the Bruen test (plain text), meaning that § 922(o) is presumptively unconstitutional.

The Tenth Circuit has rejected Second Amendment challenges to § 922(o). See United States v. Haney, 264 F.3d 1161, 1164-65 (10th Cir. 2001). However, the Tenth Circuit's reasoning was that the Second Amendment conferred no individual right and that firearm regulations are subject to means-end scrutiny. See id. Heller definitively and directly rejected the former proposition, and Bruen the latter. See Heller, 554 U.S. at 576, 582, 592-95; Bruen, 142 S. Ct. at 2126-29. As shown below, the Tenth Circuit's pre-Heller and Bruen analyses are flawed.

Turning to the second step of the Bruen test, whether banning machinegun possession is consistent with our country's historical traditions in regulating guns, Bruen makes clear that the focus of the analysis on the type of "arms" at issue lies in whether they are commonly possessed for self-defense:

> we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." Ibid. (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Id., at 629, 128 S. Ct. 2783. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

Bruen, 142 S. Ct. at 2143. Clearly such weapons cannot be used to terrorize people but banning the possession of commonly used "arms" does not comply with the dictates of the Second Amendment. Id. (recognizing that laws limiting self-defense laws in effect at the time of the Second Amendment's passage "merely codified the existing common-law offense of bearing arms to terrorize the people."). The carrying of weapons to have at the ready for self-defense is at the crux of the historical right to bear arms:

> The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").

Id. at 2148-50.

Machine guns are in common use today for the purposes of self-defense. In fact, as of April 2020, there were more than 726,000 machineguns lawfully possessed in the United States and registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives.[1] As of May 2021, that number had increased to more than 740,000 machineguns lawfully possessed and registered in the United States.[2]

---

[1] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2020*, 15–16 (2021), *available at* https://www.atf.gov/file/149886/download.
[2] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021*, 15–16

These figures demonstrate that the legal market for machineguns in the United States has not only remained robust since Congress began regulating their possession in the mid-1930's, but has in fact grown by more than 150% in the three decades since Congress enacted a purported ban on the possession of machine guns.

The number of lawfully possessed machineguns is almost quadruple the number of lawfully possessed stun guns that Justice Alito found sufficient to characterize that weapon as "widely owned and accepted as a legitimate means of self-defense." Caetano, 577 U.S. at 420 (Alito, J., concurring); see also Maloney v. Singas, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018) (finding evidence that the 64,890 nunchaku sold on the retail market in the United States between 1995 and 2018 were sufficient to show the weapon was "in common use"); Avitabile v. Beach, 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019) (finding evidence that at least 300,000 tasers were owned by private citizens in the United States sufficient to show the weapon was "in common use").

These figures also only include lawfully owned firearms that were permitted before the passage of § 922(o) in 1986. See 18 U.S.C. § 922(o)(2)(B); Pub. L. No. 99-308, sec. 102 (May 19, 1986). The number of machine guns currently lawfully and unlawfully owned by Americans is undoubtedly significantly higher. Even unlawfully owned machine guns count for the purposes of assessing whether it is in "common use." Cf. Friedman v. City of Highland Park, 784 F.3d 406, 409 (7th Cir.

---

(2021), *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

2015) (explaining "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."). Thus, as set forth above, section 922(o) is thus facially unconstitutional.

And, in this case, Mr. Shobert possessed the purported machine guns in Worland, Wyoming. There is no evidence in this case that Mr. Shobert used the guns and conversion devices the police found. There is no evidence that Mr. Shobert had ever breached the peace or "terrorized" or harmed others using these items. His simple possession of the gun and conversion devices was rather a clear exercise of his constitutional right under the Second Amendment to carry a commonly used weapon to have in case he needed to use it in his own self-defense. Therefore, § 922(o) as applied to Mr. Shobert is unconstitutional.

## CONCLUSION

The Court should dismiss Count One in the indictment because prosecution under § 922(o) violates Mr. Shobert's Second Amendment right to keep and bear arms.

DATED this 20th day of February 2024.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

*/s/Tracy Racicot Hucke*
TRACY RACICOT HUCKE
Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

      I hereby certify that on February 20, 2024 the foregoing was electronically filed and consequently served on counsel of record.

*/s/ Tracy Racicot Hucke*
Tracy Racicot Hucke